FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2012 SEP 28 PM 3: 14

CLERK
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

SECURITY LIFE OF            )
DENVER INSURANCE COMPANY,   )
                            )
    Interpleader Plaintiff, )
                            )
v.                          )       CASE NO. CV411-008
                            )
DHARMISTHA D. SHAH and      )
SOUTHEAST BUSINESS NETWORK, )
INC.,                       )
                            )
    Defendants              )
_____ )
                            )
DHARMISTHA D. SHAH,         )
                            )
    Cross-claimant,         )
                            )
v.                          )
                            )
SOUTHEAST BUSINESS          )
NETWORK, INC. and EDWARD J. )
HOWIE                       )
                            )
    Cross Defendants,       )
                            )
_____ )

## O R D E R

Before the Court are Cross-claimant Dharmistha Shah's
("Shah") Motion for Summary Judgment (Doc. 103) and Cross
Defendants Southeast Business Network, Inc. ("SEBN") and
Edward J. Howie's Motion for Partial Summary Judgment (Doc.
95) on Shah's cross-claim. For the reasons that follow,
Shah's Motion for Summary Judgment is **GRANTED IN PART** and
**DENIED IN PART** and SEBN's Partial Motion for Summary

Judgment is **DISMISSED AS MOOT**. Shah's first count seeking declaratory relief is **DISMISSED**. Shah's motion for summary judgment as to count two and count four is **DENIED**. Shah's motion for summary judgment as to Florida usury law violations in count three is **GRANTED**. Lastly, because counts six, seven, eight, and nine of Shah's amended cross-claim rely upon Georgia law, these claims are **DISMISSED**. The current cross-claims brought by Shah will proceed: count two, count four, and count five.

Before the Court proceeds any further in this complex case, the Court feels it prudent to allow each party an opportunity to brief the Court on its position as to how the interpleader action should proceed. Each party is **DIRECTED** to file, within **thirty days** from the date of this order, a single brief explaining their respective positions on the remaining cross-claims and explaining how the interpleader action should proceed in light of the rulings contained in this order. Additionally, the parties' supplemental briefs shall include any legal argument and calculations to compute the amount Shah is entitled to recover as to the usury claim.[1]

---

[1] Any filing shall not incorporate by reference or adoption any prior docket entries. Any filing must be a stand-alone brief that independently contains all the factual allegations and arguments that the filing party wishes the

**BACKGROUND**

The Court, in previous orders, has outlined the complicated factual background of this case (Doc. 160 at 3-12, Doc. 170 at 2-11), which need not be repeated in its entirety here. The relevant facts, however, warrant current mention.

During 2006, the DDS Trust and SEBN engaged in discussions regarding financing of a life insurance policy. Prior to this time, SEBN had business contacts and solicited business in Florida. In August of 2006, SEBN, through its sole principal Edward J. Howie, entered into an agreement letter ("2006 agreement letter") with the DDS Trust. (Doc. 26-1, Ex. A at 2-3.) From Florida, the DDS Trust signed and returned the policy. The agreement provided that SEBN pay the premiums for the insurance policy for months six through twenty-four. (Id. at 2) At the end of the two years, the owner of the policy—the DDS Trust—would then repay the premiums plus ten percent interest and five percent of the face value of the policy to SEBN. (Id.) If the DDS trust was unable to pay after two years, the 2006 agreement letter provided that "the trust will engage [SEBN] to sell the policy in the Life

Court to consider. The parties may attach any exhibits necessary and provide a specific citation to the docket entry, page number, and exhibit, if applicable.

Insurance Settlement Market at which time the owner of the policy will receive 15% of the proceeds of the sale." (Id. at 3.) SEBN and Mr. Dipak Shah, Defendant Shah's husband, entered into a similar agreement. Soon thereafter, the DDS Trust prepared and executed an "Assignment of Life Insurance Policy as Collateral" whereby the DDS Trust collaterally assigned certain rights to SEBN.[2] Security Life recorded the collateral assignment.

On February 21, 2007, SEBN sent the DDS Trust a modification of the 2006 agreement letter with another agreement letter that was signed and executed in Florida by the DDS Trust ("2007 agreement letter"). (Doc. 26-1, Ex. C at 8.) Pursuant to the 2007 agreement letter, after the second year of the policy, the DDS Trust would either repay SEBN according to the terms of the 2006 agreement letter, or, if the DDS Trust is "unable to pay its obligation to

---

[2] In relevant part, the assignment provided that SEBN could

> (a) collect the net proceeds of the policy from Insurer when it becomes a claim by death or maturity; (b) surrender the policy and receive the surrender value; (c) obtain loans or advances on the policy from Insurer; (d) collect all distributions or shares of surplus, dividends, deposits, and additions to the policy now or hereafter made or apportioned . . . (e) exercise nonforfeiture provisions.

(Doc. 1, Ex. B at 3.) Significantly, the assignment reserved and excluded "the right to designate and change the beneficiary." (Id.)

4

[SEBN], then the trust will transfer ownership of the life insurance policy to [SEBN] to sell the policy in the Life Insurance Settlement Market at which time the owner of the policy will receive 15% of the net proceeds of the sale." (Id. at 9.) The transfer of the policy's ownership was the material difference between the 2006 agreement letter and the 2007 agreement letter. Nowhere in the 2006 agreement letter or 2007 agreement letter did SEBN or the DDS Trust indicate what would happen if the insured died after the second year or if the policy was never sold.

After the two-year period expired, SEBN sent several letters to the DDS Trust concerning repayment options, per the 2006 and 2007 agreement letters. (Doc. 47, Ex. D; Id., Ex. E at 1.) A dispute arose over the amount that was to be repaid. (Doc. 47, Ex. E at 2, 3.) SEBN claimed that $503,279.99, including principal and interest, which the DDS Trust disputed. (Id.) According to Shah, SEBN failed to pay the premiums. In March of 2010, Security Life sent SEBN a lapse notice because no premium payments had been made and "the cash value of [the] policy is not sufficient at this time to cover the premium that is now due." (Doc. 99-4, Ex. 2 at 55.) A final grace period notice was sent on April 20, 2010 informing SEBN that the policy would terminate unless $101,345.74 was paid to bring

the premium current. (Id., Ex. 2 at 54.) The policy lapsed. Because the DDS Trust or Shah never received notice of the lapses, Security Life agreed to reinstate the policy once Shah paid $90,549.99 towards the premium. (Doc. 99-2, Ex. 1 at 30.) Following receipt of the payment, the policy was reinstated.

This interpleader action later followed. As part of the action, Shah filed a cross-claim against SEBN and Howie, alleging that SEBN materially breached the parties' agreements "by failing to pay the premiums under the policy causing the policy to lapse" and seeking declaratory relief for SEBN's purported violations of Florida law, including premium finance, usury, breach of contract, and deceptive and unfair trade practices laws. (Doc. 47.) Shah's amended cross-claim also seeks, in the alternative, to recover under Georgia law for SEBN and Howie's violations of Georgia's premium finance and loan brokering laws. (Id.) Both parties have filed competing motions for summary judgment on Shah's amended cross-claims. (Docs. 95, 103.)

## ANALYSIS

I. STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each

claim or defense—or the part or each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portion of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

> if any, which it believes demonstrate the absence
> of a genuine issue of material fact.

Celotex, 477 U.S. at 323. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts that are material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

II. CHOICE OF LAW

Federal jurisdiction is based on diversity of citizenship, and Georgia is the forum state. As a federal

court exercising diversity jurisdiction, the Court must examine the laws of Georgia, including choice of law, to determine what law applies. See McMahan v. Toto, 256 F.3d 1120, 1131 (11th Cir. 2001) (citing Klaxon Co. Stentor Elec. Mfg. Co., 313 U.S. 487, 486 (1941)); Fioretti v. Mass. Gen. Life Ins. Co., 53 F.3d 1228, 1235 (11th Cir. 1995). Georgia applies the traditional rule of lex loci contractus, Convergys Corp. v. Keener, 276 Ga. 808, 811, 582 S.E. 2d 84, 86 (2003), and an "insurance contract is constructively made at the place where the contract is delivered." McGow v. McCurry, 412 F.3d 1207, 1217 (11th Cir. 2005) (quoting Fed. Ins. Co. v. Nat'l Distrib. Co., 203 Ga. App. 763, 767, 417 S.E.2d 671, 674-75 (1992)).

While Georgia law provides that "contracts of insurance are interpreted by ordinary rules of contract construction," Lambert v. Alfa Gen. Ins. Corp., 291 Ga. App. 57, 58, 660 S.E. 2d 889, 891 (2008) (citations omitted), the issue before the Court is not the interpretation of the insurance contract, but rather of the 2007 agreement letter. The 2007 agreement letter does not contain a choice of law provision, and so the Court must look to Georgia law to determine choice of law rules. Georgia law provides that "[i]f an offer is made by letter, an acceptance by written reply takes effect from the time

it is sent and not from the time it is received." O.C.G.A. § 13-3-3. Further, the Georgia Supreme Court has held that to determine where a contract was made, the court must "determine where the last act essential to the completion of the contract was done." Gen. Tel. Co. of S.E. v. Trimm, 252 Ga. 95, 95, 311 S.E.2d 460, 461 (1984) (citing Peretzman v. Borochoff, 58 Ga. App. 838, 838, 200 S.E. 331, 331 (1938)). With such an approach, contracts are to be governed as to their "nature, validity, and interpretation by the law of the place where they were made, except where it appears from the contract itself that it is to be performed in a State other than that in which it was made, in which case . . . the laws of that sister State will be applied." Trimm, 252 Ga. at 95, 311 S.E.2d at 461.

As to the 2007 agreement letter at issue in this case, all of the additional operative facts suggest that Florida law applies here: SEBN sent the 2007 agreement letter to the DDS Trust in Florida (Doc. 125 ¶ 25); the 2007 agreement letter was offered, signed, and accepted in Florida (id. ¶ 41); and, after being signed, the 2007 agreement letter was sent from Florida to SEBN in Georgia.[3]

---

[3] Even if the parties' rights depended on where the policy is delivered, as SEBN incorrectly contends, Florida law still applies. In a similar case, SEBN has taken the position that Georgia law does not apply, arguing that

Also, the Collateral Assignment of the policy to SEBN was signed by the DDS Trust in Florida. (Doc. 47 ¶ 40.) Moreover, SEBN admits it conducted business in Florida by not only soliciting funding there (Doc. 105 ¶¶ 47, 48), but also by sending checks to the DDS Trust in Florida to fund the premium (Id. ¶¶ 50, 51). (Doc. 140.) Accordingly, Florida law applies.[4]

## II. SEBN & HOWIE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

SEBN and Howie have moved for partial summary judgment, arguing that Georgia law applies and, thereby, rendering Shah's cross-claims applying Florida law moot. (Doc. 97.) Additionally, SEBN and Howie contend that under Georgia law, they are entitled to summary judgment because SEBN and Howie are not "loan brokers" as defined under Georgia law. (Id. at 11-12.) In response, Shah alleges that applying Florida law, SEBN and Howie engaged in usurious, deceptive, and illegal premium financing

---

"[SEBN] is a New Hampshire corporation in good standing which has conducted three total transactions; one in New Hampshire and two in Florida," that SEBN "solicits no business in Georgia and has no business in Georgia," and that "the finance agreement was sent to Florida and was accepted and signed in Florida." Se. Bus. Network, Inc. v. Jitendra R. Kotadia, Superior Court of Chatham County, Georgia, CV08-2189-MO. (Doc. 104. at 10-11.) SEBN cannot, and will not, have it both ways.

[4] Counts six, seven, eight, and nine of Shah's amended cross-claim all rely upon Georgia law. (Doc. 47.) Because Florida law applies, these claims are **DISMISSED**.

arrangements. (Doc. 143.) Because Florida law applies, SEBN and Howie's "Motion for Partial Summary Judgment" (Doc. 95) is **DISMISSED AS MOOT**. Moreover, to the extent that SEBN and Howie seek summary judgment in their favor on the remaining claims asserted by Shah, their motion is **DENIED**. See infra Analysis.III.

## III. SHAH'S MOTION FOR SUMMARY JUDGMENT

Shah also has moved for summary judgment. (Doc. 103.) Shah argues that Florida law applies that SEBN breached the 2007 agreement letters, and that any such agreements were usurious and violative of Florida's Finance Companies and Agreement Act. (Id. at 1-3.) In response, SEBN and Howie argue that the policy was funded through June of 2010, well beyond the second anniversary date, that the agreements are "investments rather than loans and are not subject to usury laws," and that "the agreements do not constitute premium financing under Georgia or Florida's statutory definition even if Florida law were to apply." (Doc. 139 at 1-2.)

### A. Declaratory Relief

In count one, Shah seeks an equitable declaratory judgment that the 2007 agreement letter is unenforceable and that SEBN has no right to any portion of the death benefits under the policy. (Doc. 47 ¶¶ 57-67.) In seeking their own partial summary judgment (Doc. 95), SEBN contends

that "SEBN [is entitled] to the immediate possession of the death benefits" and that the Court should "release the funds to SEBN as first assignee without further delay" (Doc. 97 at 4). At this time, it is unclear the amount of the policy proceeds either Shah or SEBN are entitled. The proper determination as to how the policy proceeds be disbursed is through the interpleader action itself. Any declaratory judgment to either claimant are premature. As a result, Shah's motion for summary judgment in her favor is **DENIED** and her declaratory judgment claim is **DISMISSED**.

B.   § 627.840 Fla. Statute – Excessive Premium Finance Charges

In count two, Shah seeks to invalidate the 2007 agreement letter because the charges imposed by SEBN—acting as an illegitimate Florida insurance premium finance company in Florida—exceeded those permitted under Florida law. (Doc. 47 ¶¶ 68-73.) Shah has moved for summary judgment on these grounds because the 2007 agreement letter was a premium finance agreement and, accordingly, SEBN was an insurance premium finance company under Florida law. (Doc. 104 at 21.) By adopting prior argument and analysis, SEBN in response (Doc. 141 at 9) contends that the agreement is considered "private financing" because the monies "are not paid to the insurer or the agent and SEBN

is not engaged in the financing business" (Doc. 97 at 5-6).[5] SEBN argues that the Florida statute's scope is limited to those insurance premium finance companies who pay premimums directly to insurers, because otherwise "any private individual in Florida who provide[s] private monies to pay a premium or premiums on a single occasion would be required to register as a premium finance company." (Doc. 97 at 5.) Shah submits that, according to SEBN's reasoning, "any premium finance company could simply avoid Florida law by doing exactly what SEBN did; finance the policy premiums by sending the advances to the insured for remittance to the insurer." (Doc. 143 at 16-17.)

In Florida, those engaged in the business of entering into finance agreements with insureds are subject to various statutory obligations. Fla. Stat. § 627.840. Florida's Finance Companies Agreement Act defines a premium finance agreement as

> a promissory note or other written agreement by which an insured promises or agrees to pay to, or to the order of, a premium finance company the amount advanced or to be advanced under the agreement to an insurer or to an insurance agent,

---

[5] Given the voluminous nature of the docket in this case, the parties should be aware that the Court will not accept any future filings which adopt or incorporate by reference previous docket entries. Any filing must stand-alone and that independently contain all the factual allegations and arguments that the filing party wishes the Court to consider.

in payment of premiums on an insurance contract, together with a service charge as authorized and limited by law.

Fla. Stat. § 627.827. A premium finance company is "a person engaged, in whole or in part, in the business of acquiring premium finance agreements with insureds." Fla. Stat. § 627.826(1)(a). Significantly, "no person shall engage in the business of a premium finance company unless licensed by the office [of Insurance Regulation of the Financial Services Commission.]" Fla. Stat. § 627.828(1). The finance agreement must be in writing and certain statutory requirements are imposed regarding type size, titles, and contain various warnings and disclosures. Fla. Stat. § 627.839. The law also limits the amounts of service charges that may be charged. Fla. Stat. § 627.840.[6]

---

[6] Fla. Stat. § 627.840 requires that

(1) A premium finance company shall not charge, contract for, receive, or collect a service charge other than as permitted by this part.

(2) A premium finance company may, in a premium finance agreement, contract for, charge, receive, and collect a service charge for financing the premiums under the agreement computed as provided in subsection (3).

(3)(a) The service charge provided for in this section shall be computed on the balance of the premiums due, after subtracting the down payment made by the insured in accordance with the premium finance agreement, from the effective date of the insurance coverage for which the

The penalty provision for an excessive or invalid premium finance charge provides that

> [A]ny person, premium finance company, or other legal entity who or which knowingly takes, receives, reserves, or charges a premium finance charge other than that authorized by this part shall thereby forfeit the entire premium finance charge to which such person, premium finance company, or legal entity would otherwise be entitled.

---

premiums are being advanced to and including the date when the final payment of the premium finance agreement is payable.

(b) The service charge shall be a maximum of $12 per $100 per year plus an additional charge not exceeding $20, which additional charge need not be refunded upon prepayment. Such additional charge may be charged only once in a 12-month period for any one customer unless that customer's policy has been canceled due to nonpayment within the immediately preceding 12-month period. However, any insured may prepay her or his premium finance agreement in full at any time before the due date of the final payment; and in such event the unearned service charge shall be refunded in accordance with the "Rule of 78ths," or any other method at least as beneficial to the insured and approved by the office, and shall represent at least as great a proportion of the service charge, if any, as the sum of the periodic balances after the month in which prepayment is made bears to the sum of all periodic balances under the schedule of payments in the agreement. When the amount of the refund is less than $1, no refund need be made if the agreement so states.

(c) Such service charge shall be inclusive of all charges incident to the premium finance agreement and for the extension of credit provided for therein.

Fla. Stat. § 627.835.  In addition, any interest charged by a premium finance company is subject to the interest rate requirements contained in Fla. Stat. § 687.12.[7]

At present, the critical issue is whether SEBN engaged in issuing premium financing agreements, which would then subject it—as an insurance premium finance company—to various statutory obligations.  Based on the record in this case, SEBN has engaged in premium financing by contracting with the DDS Trust in the 2007 agreement letter.  The 2007 agreement letter is a written agreement that outlines the insured's agreement for SEBN to fund policy premiums as well as the applicable service charges.  (Doc. 26-1, Ex. C at 8.)  Because SEBN is engaged in the business of entering premium finance agreements, it is, by statute, an "insurance premium finance company."  Fla. Stat. § 627.826. However, SEBN is neither licensed by Florida's Office of Insurance Regulation of the Financial Services, as required by Fla. Stat. § 627.828(1), nor did it file or obtain

─────────────────────

[7] Fla. Stat. § 687.12(4) requires that

> [i]n making loans or extensions of credit at a rate of interest that, but for this section, would not be authorized, lenders or creditors shall indicate on the promissory note or other instrument evidencing the loan or extension of credit the specific chapter of the Florida Statues authorizing the interest rate charged.

17

approval of the service charge and interest rate plan, as required by Fla. Stat. § 627.838(2). Moreover, the 2007 agreement letter is deficient as to the form and contents requirements and void of nearly all the requirements under Fla. Stat. § 627.839.

Finally, based on the record and testimony of Shah's expert witness—Timothy O'Toole—the service charges and interest of the 2007 agreement letter exceed those permitted by law. See Fla. Stat. §§ 627.840(3)(a)-(b), 687.12. In its numerous briefs or responses, SEBN never contests that the charges did not exceed the specific statutory limitations that premium finance companies can charge. See S.D. Ga. L.R. 7.5 ("Failure to respond . . . shall indicate that there is no opposition.").

The Court is not persuaded by SEBN's contention that the 2007 agreement letter is not a premium finance agreement because SEBN did not directly pay an insurer or an insurance agent. (Doc. 97 at 5-6.) Indeed, the 2007 agreement letter expressly provides that SEBN "will finance months 6 through 12 at $30,183.33 per month or a total of $211,283.31 for the first year and the next 12 months, being year 2, at an approximate minimum premium cost of $152,876.00." (Doc. 26-1 at 8-12.) SEBN, a company, is contracting with a private group, the DDS Trust, to

"finance[ ] the premiums."  (Id. at 8.)  Shah then agreed to pay to SEBN the amount advanced with interest and an additional service charge.  (Id.)  The 2007 agreement letter expressly provides that the funding will finance the premiums for the policy.  Nowhere in the Florida's Finance Companies and Agreement Act does it express who must deliver the premium funding, only who finances the money itself.  Here, it was SEBN, as a insurance premium finance company who was providing the funding.

It is hardly the slippery slope that SEBN contends that "any private individual in Florida who provided private monies used to pay a premium or premiums would be required to register as a premium finance company."  (Doc. 97 at 5-6.)  What SEBN fails to acknowledge, however, is that the law covers those cases where there are service charges and interest assessed against the insured.  To permit such a statutory interpretation would allow any insurance premium finance company to simply circumvent Florida's Finance Companies and Agreement Act by simply filtering premium checks through the insured, who then remits them to the insurer.

Critically, however, Shah readily admits the existence of a genuine issue of material fact—that is, whether SEBN knowingly charged an unauthorized premium.  (Doc. 104 at

24.) For the penalty provisions to apply, the statute requires a "person, premium finance company or other legal entity" to "knowingly take[], receive[], reserve[], or charge[] a premium finance charge other than that authorized." Fla. Stat. § 627.835 (emphasis added). Indeed, whether a person or insurance premium finance company knowingly overcharged in violation of the statute is a question of fact for a jury to decide. Sosa v. Safeway Premium Fin. Co., 73 So. 3d 91, 105 (Fla. 2011). Thus, Shah's motion for summary judgment as to Florida's premium finance must be **DENIED**.

C. § 687.03 & 687.071 Fla. Statutes - Usury

In count three, Shah alleges that SEBN violated Florida usury laws by charging interest that exceeded the statutory limit. (Doc. 47 ¶¶ 74-80.) Specifically, Shah contends that the "interest imposed by SEBN on Shah exceeds that permitted by [Fla. Stat.] §§ 687.03 and 687.071" (id. ¶ 79), and as a result, "the [2007 agreement letter is] unenforceable, and [subjects] SEBN to the penalties prescribed therein" (id. ¶ 80). Shah has moved for summary judgment, arguing that the undisputed evidence shows that SEBN violated Florida's usury laws, subjecting SEBN to the statutory penalties. (Doc. 104 at 18-21.) In response, SEBN claims that the agreement was not a true loan and

involved risks and "unforeseeable contingenc[ies] that the policy could be sold" (Doc. 141 at 6-8), thereby rendering the agreement non-usurious because the funding provided was a contingent investment.

Florida law prevents lenders from contracting to charge usurious interest that exceeds the statutory maximum. Under Florida law, a contract is defined as usurious when the rate of interest exceeds 18% on loans less than $500,000 and 25% on those loans that exceed $500,000. Fla Stat. § 687.02(1). Where a loan is deemed to be usurious, the lender forfeits all interest charged or contracted to be charged. Fla. Stat. § 687.04; Jersey Palm-Gross, Inc. v. Paper, 639 So. 2d 664, 667 (Fla. Dist. Ct. App. 1994) ("The penalties for civil usury include forfeiture of all interest charged; the civil penalties for criminal usury are forfeiture of the right to collect the debt.").

However, "transactions in which a portion of the investment is at speculative risk," are excluded from applicability under the usury statue. Oregrund Ltd. P'ship v. Sheive, 873 So. 2d 451, 456 (Fla. Dist. Ct. App. 2004) (citing Hurley v. Slingerland, 461 So. 2d 282, 283 (Fla. Dist. Ct. App. 1985); Diversified Enter., Inc. v. West, 141

So. 2d 27 (Fla. Dist. Ct. App. 1962)). To determine whether a transaction is usurious under Florida law,

> the substance of a transaction rather than the form will be examined to determine whether a transaction not cast in the form of a loan nevertheless constitutes a usurious loan transaction. For the purpose of determining substance, parol evidence is admissible, including all negotiations, circumstances and conduct of the parties surrounding and connected with their contract, any or all of which may be material in determining whether the form of the transaction covered an intent to violate the usury law.

Growth Leasing, Ltd. v. Gulfview Adver., Inc., 448 So. 2d 1224, 1225 (Fla Dist. Ct. App. 1984) (citing Indian Lake Estates, Inc. v. Special Invs., Inc., 154 So. 2d 883, 883 (Fla. Dist. Ct. App. 1963)); see also Pinchuck v. Canzoneri, 920 So. 2d 713, 715 (Fla. Dist. Ct. App. 2006) (explaining that it is the substance, not the form, that determines usury). Generally, "the usurious nature of a contract is determined or determinable at the contract's inception." Sharp v. Dixon, 252 So. 2d 805, 808 (Fla. Dist. Ct. App. 1971).

For a contract to be usurious, there are four essential elements that must be present: "(1) an express or implied loan, (2) a repayment requirement, (3) an agreement to pay interest in excess of the legal rate, and (4) a corrupt intent to take more than the legal rate for the

money loaned." <u>Oregrund</u>, 873 So. 2d at 456 (citations omitted). The corrupt intent requirement simply requires that the lender had the intent to exact interest in an amount that is usurious in fact and in law and no showing of an intent to violate the statute is required. <u>Saralegui v. Sacher, Zelman, Van Sant Paul, Beily, Hartman & Waldman, P.A.</u>, 19 So. 3d 1048, 1051 (Fla. Dist. Ct. App. 2009) (holding that "corrupt intent does not require knowledge of the usury statutes . . . and a specific intention to violate them," but only that the lender intended to collect payments that exceed the maximum rate established by law) (citing <u>Am. Acceptance Corp. v. Schoenthaler</u>, 391 F.2d 64, 73 (5th Cir. 1968));[8] <u>Blanco v. Kinas</u>, 936 So. 2d 31 (Fla. Dist. Ct. App. 2006); <u>Valliappan v. Cruz</u>, 917 So. 2d 257 (Fla. Dist. Ct. App. 2005).

From the circumstances and the substance of the 2007 agreement letter, it does not rely on a contingent or place SEBN's investment into a sufficiently substantial risk. While SEBN, as the lender, did provide the principal, the risk was no more than "the mere hazard that a borrower will fail to repay (due to lack of financial ability) or that a

---

[8] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 109 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

lender will not recover in full because of a decline in the value of security." *In re Transcapital Fin. Corp.*, 433 B.R. 900, 910 (Bank. S.D. Fla 2010) (citing *Beausejour Corp., N.V. v. Offershore Dev. Co, Inc.*, 802 F.2d 1319, 1321-22 (11th Cir. 1986); *Diversified Enter.*, 141 So. 2d at 30. Unlike the bankruptcy court in *In re Transcapital*, where recovery was contingent on the outcome of a trial, here, SEBN has failed to demonstrate how the 2007 agreement letter not only constitutes a contingency, but also represents a substantial risk. Pursuant to the 2007 agreement letter, SEBN stood to recover in some capacity— whether by having the DDS Trust pay SEBN "its obligation" or having ownership of the policy transferred to SEBN.[9] (Doc. 26-1 at 8-9.)

After two years, the DDS Trust was to pay SEBN the amount in premiums advanced plus ten percent annual interest and five percent of the policy value—$250,000. (*Id.* at 9.) SEBN claimed that it was owed $503,279.99. (Doc. 47, Ex. E at 2.) SEBN itemized $211,066.66 for premium financing, $42,213.33 for interest, and $250,000.00 for five percent of the policy's value. (*Id.*) According

---

[9] The Court is not persuaded by SEBN's arguments against summary judgment of the usury claims by involving Mr. Dipak Shah, a non-party. Any motive or action by Mr. Shah is an irrelevant non-sequitur.

to Shah's expert witness, the effective annual interest rate for this period ranges from 78.552% to 112.307%. (Doc. 106-14, App'x 14 at 3-4.) SEBN has neither retained an expert to suggest a different rate nor objected to the calculation proffered by Shah's expert. Whatever the calculation—whether 78% or 112%—that undisputed amount exceeds the maximum statutory limits. See Fla. Stat. §§ 687.03, 687.071.

All requirements for a usurious contract have been met: there is an express contract with a repayment requirement; the agreement provides for interest to be paid in excess of the legal rate; and there is a corrupt intent to take more than the legal rate as provided in Saralegui, 19 So. 3d at 1051. See Oregrund, 873 So. 2d at 456. Thus, the 2007 agreement letter is usurious and Shah's motion for summary judgment is **GRANTED**. As a result, the parties may address in their supplemental brief any calculations and legal support for the amount of disbursements and relief that Shah is entitled, given the statutory usury penalty provisions.

D.    Breach of Contract - 2007 Agreement Letter

In count four, Shah alleges that SEBN materially breached the 2007 agreement letter by "failing to pay the premiums on the policy pursuant to the terms of the [2007

agreement letter], resulting in the lapse of the policy."
(Doc. 47 ¶ 87.)   Further, Shah contends that SEBN also
breached the 2007 agreement letter because it "caus[ed]
Shah to transfer ownership of the policy to SEBN in 2008
knowing that SEBN had not paid the premiums on the policy
per the terms of the [2007 agreement letter]."  (Id. ¶ 88.)
Shah has moved for summary judgment on count four, arguing
that SEBN's material breach of the 2007 agreement letters
excused the DDS Trust's performance.   (Doc. 104 at 14-17.)
In response, SEBN argues that any ambiguity regarding "the
minimum amount of financing needed to carry the policy to
its second anniversary date" is moot because the "policy
was fully paid and had an additional reserve of over
$274,000" in July of 2008.   (Doc. 141 at 5.)   SEBN
speculates that because Shah was an irrevocable
beneficiary, "[n]o buyer would agree to buy and continue to
fund [the] policy" and, therefore, SEBN could not breach
the agreement.  (Id. at 6.)

Under Florida law, the interpretation and construction
of a contract is ordinarily a question of law for the trial
court when the terms are " 'unequivocal, clear, undisputed,
and not subject to conflicting inferences.' "   Langer v.
Charles A. Binger, Inc., 503 So. 2d 1362, 1363 (Fla. Dist.
Ct. App. 1987) (quoting Quayside Assocs. v. Harbour Club

Villas Condo. Ass'n, 419 So. 2d 678, 679 (Fla. Dist. Ct. App. 1982) (citations omitted)). When the terms "of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented which cannot properly be resolved by summary judgment." Id. Moreover, if a contract is ambiguous, Florida law provides that the contract be construed against the drafter. DSL Internet Corp. v. Tigerdirect, Inc., 907 So. 2d 1203, 1205 (Fla. Dist. Ct. App. 2005). Where one party has materially breached a contract, the other party's contractual obligations are excused. Nacoochee Corp. v. Pickett, 948 So. 2d 26, 30 (Fla. Dist. Ct. App. 2006) (citing Rose Printing Co. v. Haggerty, 584 So. 2d 606 (Fla. Dist. Ct. App. 1991)).

Here, interpretation of the 2007 agreement letter is neither unequivocal nor clear. Moreover, the parties dispute the proper interpretation of the provision defining "minimum" premium costs for the second year. Additionally, SEBN and Shah disagree over the construction of part of the 2007 agreement letter as it pertains to providing minimum premium funding in the second year. (Doc. 104 at 14-17; Doc. 141 at 4-6.) Because these terms are disputed and a jury could reasonably find more than one construction, summary judgment is improper. See Langer, 503 So. 2d at

1363. Accordingly, Shah's motion for summary judgment must be **DENIED**.

## CONCLUSION

For the foregoing reasons, Shah's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** and SEBN's Partial Motion for Summary Judgment is **DISMISSED AS MOOT**. Shah's second count seeking declaratory relief is **DISMISSED**. Shah's motion for summary judgment as to counts two and four are **DENIED**. Shah's motion for summary judgment as to Florida usury law violations in count three is **GRANTED**. Lastly, because counts six, seven, eight, and nine of Shah's amended cross-claim rely upon Georgia law, these claims are **DISMISSED**. The current cross-claims brought by Shah will proceed: count two, count four, and count five.

Before the Court proceeds any further in this complex case, the Court feels it prudent to allow each party an opportunity to brief the Court on its position as to how the interpleader action should proceed. Each party is **DIRECTED** to file, within **thirty days** from the date of this order, a single brief explaining their respective positions on the remaining cross-claims and explaining how the interpleader action should proceed in light of the rulings contained in this order. Additionally, the parties'

supplemental briefs shall include any legal argument and calculations to compute the amount Shah is entitled to recover as to the usury claim.[10]

SO ORDERED this **28**th day of September 2012.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[10] The parties are again reminded that any filing should not incorporate by reference or adoption any prior docket entries. Any filing must a be stand-alone response that independently contains all the factual allegations and arguments that the filing party wishes the Court to consider. The parties may attach any exhibits necessary or to provide a specific citation to the docket entry, page number, and exhibit, if applicable.